IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

CROSSFIT, INC.                                                                                    PLAINTIFF

VS                                          CIVIL ACTION NO. 1:13-CV-00144-GHD-DAS

COLUMBUS CROSSFITNESS LLC;
CHANCE WIYGUL; and JOHN DOES 1-25                                      DEFENDANTS

## MEMORANDUM BRIEF IN SUPPORT OF CROSSFIT, INC.'S MOTION FOR DEFAULT JUDGMENT AND PERMANENT INJUNCTION

COMES NOW Plaintiff CrossFit, Inc., by and through counsel, and for its Memorandum Brief in Support of its Motion for Default Judgment and Permanent Injunction would show the Court as follows, to-wit:

## I.   INTRODUCTION

CrossFit, Inc. (" CrossFit") is the global leader in small-box fitness programming and the owner of several federally registered trademarks and service marks comprised of the word mark CROSSFIT® ("CROSSFIT® Marks"). CrossFit's fitness training paradigm is based on constantly varied, high-intensity, functional movements performed in small gym environments that foster natural camaraderie, competition, and the fun of sport. Only licensed CrossFit affiliates are authorized to use the CROSSFIT® Marks in connection with fitness training services pursuant to the terms of annually renewable affiliate licensing agreements.

This case arises out of Defendants' infringement of the CROSSFIT® Marks and other unlawful conduct. Defendants Chance Wiygul, individually and through the company Columbus Crossfitness, LLC, utilized the CROSSFIT® Marks to trade on the goodwill associated with the CrossFit name, leading unsuspecting members of the public to pay Defendants for what they may have believed was licensed CrossFit training, despite the fact that Defendants are not, nor have they

ever been, licensed CrossFit affiliates. CrossFit repeatedly requested that Defendants cease and desist their use of the CROSSFIT® Marks, but despite Defendant Wiygul's verbal and written assurances to CrossFit that he would and did comply, Defendants continued their use of CROSSFIT® Marks long after Mr. Wiygul represented to CrossFit that he had removed his infringing marks from his business and his websites.

As a result, CrossFit filed suit against Defendants for violations of the Lanham Act, including trademark infringement, false designation of origin, violations of the Anticybersquatting Consumer Protection Act, and trademark dilution. To date, Defendants have failed to file any responsive pleading or otherwise appear, and the Clerk's Entry of Default has been entered against Defendants Chance Wiygul and Columbus Crossfitness, LLC.

CrossFit respectfully moves this Court to enter a default judgment against Defendants Chance Wiygul and Columbus Crossfitness, LLC, that provides both monetary and injunctive relief. The total monetary damages sought by CrossFit is $75,000.00: consisting of $61,381.80 in damages and profits, in statutory damages, $12,426.61 in attorney's fees, and $1,191.59 in costs. Additionally, CrossFit requests a permanent injunction precluding Defendants, or either of them, from using the CROSSFIT® Marks in any manner, and for any reason, whatsoever.

## II. FACTS

### A. THE CROSSFIT® MARKS

Through its design, development, sales, and marketing activities, CrossFit has developed a revolutionary fitness training regimen that has become the principal strength and conditioning program for many police academies and tactical operations teams, military special operations units, champion martial artists, and thousands of professional and amateur athletes worldwide. Exhibit

A," Affidavit of Marshall Brenner, ¶ 4. CrossFit is widely known for its CrossFit Games, a fitness competition aired nationally by ESPN. Exhibit "A," ¶ 7. At the 2013 CrossFit Games, elements of the competition required the athletes to walk on their hands for 90 feet and to perform handstand pushups, movements typically associated with overall body strength. Exhibit "A," ¶ 7. CrossFit has also expanded into fitness apparel through strategic partnerships with companies such as Reebok. Exhibit "A," ¶ 11, Ex. 2.

The CROSSFIT® Marks have been in use since the early 1980s. With over 9,000 affiliate gyms worldwide, CrossFit has quickly grown to be larger than Gold's Gym and 24 Hour Fitness combined.[1] Exhibit "A," ¶ 5. CrossFit's careful cultivation, maintenance, and protection of its intellectual property rights has enabled CrossFit to amass considerable goodwill within its industry, and the CROSSFIT® Marks are widely recognized around the world. Exhibit "A," ¶¶ 3-6, 9-11. Indeed, the Chief Judge of the Southern District of California recently issued an order granting CrossFit's Motion for Preliminary Injunction in which he found that the CrossFit mark is famous. Exhibit "B," *Order Granting Motion for Preliminary Injunction*, p. *7.

CrossFit diligently protects its intellectual property through trademark and service mark registration. CrossFit owns several registered United States trademarks and service marks comprised of the word mark "CrossFit," including registered U.S. Service Mark Registration No. 3,007,458, issued on October 18, 2005, for use in connection with fitness training services. Exhibit "A," ¶ 11, Ex. 2. *See also* registered U.S. Service Mark Registration No. 3,826,111, issued on July 27, 2010,

---

[1]Gold's Gym advertises that they have "700-plus gyms around the world," *www.goldgym.com*, and 24 Hour Fitness states that they have more than 400 clubs, *www.24hourfitness.com*.

for use in connection with the sale of fitness-related clothing, *i.e.*, shirts, pants, shorts, jackets, sweatshirts, sweatpants, headwear, and socks. Exhibit "A," ¶ 11, Ex. 3. The CROSSFIT® Marks have been in continuous use in commerce since, at the latest, the dates of first use identified in their registrations. Exhibit "A," ¶ 11.

CrossFit provides a nationally standardized accreditation program to personal trainers who desire to become licensed CrossFit affiliates. Persons who successfully complete CrossFit's accreditation program and meet other requirements for affiliation are eligible to enter into annually renewable affiliate license agreements which permit limited use of the CrossFit mark subject to various conditions. Exhibit "A," ¶ 5. Only those persons who have completed CrossFit's accreditation process and entered into valid affiliate license agreements are permitted to use the CROSSFIT® Marks. Exhibit "A," ¶ 6. Some examples of current, licensed CrossFit affiliates include DeSoto CrossFit in Southhaven, MS; Olive Branch CrossFit in Olive Branch, MS; CrossFit 27/17 in Flowood, MS; and Mississippi CrossFit in Ridgeland, MS. Exhibit "A," ¶ 6.

**B.     DEFENDANTS' INFRINGEMENT OF THE CROSSFIT® MARKS**

Sometime prior to January 1, 2013, Defendant Chance Wiygul and his business entity, Columbus CrossFitness, LLC, began offering fitness training services under the name "CrossFitness 24/7." Exhibit "A," ¶¶ 12-13. Mr. Wiygul offered CrossFit classes at the gym owned by him, also named CrossFitness 24/7, which appeared to be a direct replica of licensed CrossFit affiliates. Exhibit "A," ¶¶ 14-15, Ex. 4. Defendants advertised their fitness training services through the same marketing channels used by CrossFit, including various internet media; Defendants' website domain name and their e-mail address included the term "Crossfitness," *i.e., www.crossfitness247.com* and

4

*Crossfitnesscolumbus@gmail.com,* respectively. Exhibit "A," ¶¶ 8, 14-15.   Given the services offered and the training programs Defendants utilized, Defendant Wiygul appears to have chosen the name CrossFitness specifically for the purpose of causing confusion and leading the public to believe that he is operating a licensed CrossFit affiliate, which he is not.  Exhibit "A," ¶ 12.

## C.   PLAINTIFF'S REQUESTS THAT DEFENDANTS CEASE AND DESIST THEIR INFRINGEMENT OF THE CROSSFIT® MARKS

In early 2013, CrossFit contacted Defendants on multiple occasions and requested that they cease infringement of the CROSSFIT® Marks.   Chance Wiygul responded to CrossFit indicating that he would comply with CrossFit's demands and stop using the mark. Exhibit "A," ¶ 16, Ex. 5. However, he failed to take the steps needed to comply, and Plaintiff retained outside counsel to address Defendants' unauthorized use of its marks.  Exhibit "A," ¶ 16.

On April 24, 2013, CrossFit's counsel, Christina Bobb, sent Mr. Wiygul a cease and desist letter.  Exhibit "D," Affidavit of Christina G. Bobb, ¶ 3, Ex. 1.  When Mr. Wiygul spoke with Ms. Bobb by telephone on April 26, 2013, he acknowledged that he was using the name "CrossFitness" in his gym's name, and advertising his services as "CrossFitness" services.  During that conversation, Mr. Wiygul agreed to change the name of his gym, to stop his infringement of the CrossFit mark, and to have all of the infringing materials disposed of by June 1, 2013.  Exhibit "D," ¶ 3.

On April 29, 2013, Mr. Wiygul sent Ms. Bobb an e-mail outlining the steps he planned to eliminate his unauthorized use of Plaintiff's mark, and confirming that he would have his website and Facebook page removed by 8:00 p.m.  He also stated that his sign containing the infringing mark "Crossfitness," would be changed by May 6, 2013. Ms. Bobb replied the same day, emphasizing that it was important to CrossFit that his websites be removed that day.  Exhibit "D," ¶ 4, Ex. 3.

On May 7, 2013, Mr. Wiygul sent Ms. Bobb an e-mail saying that the sign had been changed as promised, and that his only remaining step was to have his business name changed with the Secretary of State. Mr. Wiygul's e-mail clearly represented that he had removed all affiliations with CrossFit from his gym and that a new sign was hung with no affiliation to CrossFit. Ms. Bobb responded promptly, asking that Mr. Wiygul send her a photo of the sign for verification. On May 8, 2013, Mr. Wiygul replied by e-mail that he was in Boston so unable to comply, but would do so "as soon as" he returned. Exhibit "D," ¶ 5, Ex. 4.

When she had not received any further communication from Mr. Wiygul, on May 14, 2013, Ms. Bobb contacted Mr. Wiygul, asking again that he confirm that the new sign had actually been installed. The following day, Mr. Wiygul replied that a storm had torn down the new sign and he was therefore unable to send her a picture. On May 16, 2013, Ms. Bobb wrote back to Mr. Wiygul specifying the information she needed to verify that he had corrected his several infringing uses of CrossFit's mark. Exhibit "D," ¶ 6, Ex. 5. Ms. Bobb also spoke with Mr. Wiygul on May 16, 2013, regarding the requested verification.

However, on May 17, 2013, Ms. Bobb learned that Defendants' sign, "CrossFitness 24/7," had not been removed as Mr. Wiygul had represented. Ms. Bobb telephoned Mr. Wiygul to discuss the matter. Mr. Wiygul admitted that he had been dishonest about the corrective actions he claimed had been taken, and agreed to change his sign and dispose of any materials identifying his gym as a CrossFit gym. Exhibit "D," ¶ 7. However, when Ms. Bobb attempted to follow up with him regarding the dissolution of Columbus CrossFitness, LLC, Mr. Wiygul was evasive, routinely explaining that he had been out of town and unable to address the dissolution. Exhibit "D," ¶ 8.

Throughout the months that CrossFit and its counsel attempted to address Defendants' infringement with Mr. Wiygul, Defendants' Facebook page continued to advertise their services by using the CrossFitness 24/7 model and including photos of their weightlifting platforms with the word "CrossFitness" painted across the top of the platform. Exhibit "D," ¶ 9, Ex. 6-7. By August 6, 2013, Plaintiff determined that any further attempt to negotiate with Mr. Wiygul would be futile.

### III.   PROCEDURAL HISTORY

After repeated efforts to work amicably with Defendant Wiygul, CrossFit had no reasonable alternative to filing suit. On August 6, 2013, Plaintiff's Complaint was filed. Doc. #1. On August 15, 2013, CrossFit personally served Defendants Columbus CrossFitness, LLC, and Chance Wiygul with its Summons and Complaint.[2] Docs. #4, #5. Defendants' responsive pleading was due on or before September 5, 2013. Fed. R. Civ. P. 12(a)(1)(A)(i). To date, Defendants have failed to respond to Plaintiff's Complaint or to otherwise appear in this cause. The Court issued a Notice of Past Due Answer on October 7, 2013. Doc #10. Upon motion of the Plaintiff, Doc. #11, the Clerk's Entry of Default was entered against both Defendants herein on October 16, 2013. Doc. #12.

After Defendants failed to timely answer CrossFit's Complaint, Ms. Bobb resumed her efforts to discuss proceedings in this matter with Mr. Wiygul by telephoning CrossFitness, LLC, on September 13, 2013. She left a detailed message for a return call and contacted the gym by email at the same address used previously. Defendants did not respond. Exhibit "D," ¶ 10. On October

---

[2]Chance Wiugul is the registered agent for Columbus Crossfitness, LLC. *See* Exhibit "E," Corporate information for Defendant Columbus Crossfitness, LLC filed with the Mississippi Secretary of State.

7, 2013, Ms. Bobb called Defendants at a number listed for "CrossFitness 24/7" in the Columbus Yellow Pages, and she left another voice mail message for Mr. Wiygul. Exhibit "D," ¶ 11.

The Clerk's Entry of Default was entered against both Defendants herein on October 16, 2013. Doc. #12. Thereafter, Mr. Wigul resumed contact with Ms. Bobb by telephone and e-mail, but his responses did not address the remaining marks, and did not resolve his failure to dissolve Columbus CrossFitness, LLC. Exhibit "D," ¶ 11, Ex. 8.

Plaintiff's contact with Defendants, both before and after suit was filed, has not resulted in relief to Plaintiff for Defendants' infringement. Although Defendants removed some of the infringing marks observed previously, Defendants have not removed all of them, and have not yet dissolved the entity Columbus CrossFitness, LLC. Exhibit "D," ¶ 9, Ex. 7. In fact, even as of the date of the filing of this Motion, Columbus CrossFitness, LLC, is still shown as being in good standing on the Mississippi Secretary of State's business services website. Exhibit "E."

Defendant Wiygul's prior actions, his repeatedly broken promises to remove the infringing marks, his failure to remove all infringing marks and to dissolve the limited liability company CrossFitness, LLC, coupled with his ongoing dishonesty with Plaintiff regarding his actions, leaves this Plaintiff with no reason to believe that Defendants' intentional infringing use of its marks will not continue and/or happen again in the future. Accordingly, Plaintiff now moves for a default judgment against Defendants herein, Columbus CrossFitness, LLC, and Chance Wiygul, for injunctive relief and for monetary damages.

8

## IV. LEGAL ANALYSIS

### A.    MERITS OF THE CLAIM

In order to succeed in a claim under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, a Plaintiff must "first 'establish ownership in a legally protectable mark, and second, . . . show infringement by demonstrating a likelihood of confusion'" of the protected mark with the infringing mark by members of the public. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235-236 (5th Cir. Tex. 2010)(citations omitted).

#### 1.    Plaintiff Owns the Legally Protectable CROSSFIT® Marks

"Under the (Lanham) Act, registration is prima facie evidence of the registrant's ownership of the mark and of the registrant's exclusive right to use the mark in commerce in connection with the services specified in the registration certificate." *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 10 (5th Cir. Tex. 1974), citing 15 U.S.C. §§ 1057(b), 1115(a).   As shown by the trademark registrations filed with the instant motion, CrossFit has provided this Court with prima facie evidence its ownership of a valid and legally protectable trademark in the CROSSFIT® marks.  Exhibit "A," ¶ 11, Ex. 2.

#### 2.    Defendants' Services Cause a Likelihood of Confusion Between its Marks and Those of Crossfit.

"(I)t is the accepted rule that (trademark) infringement may be established by showing only that confusion is likely, and there need be no showing of actual confusion or deception if the mark is of such character or is used in such a way as to likely confuse a prospective purchaser." *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 624 (5th Cir. 1963)(citations omitted).  The Fifth

Circuit has long used a list of seven (7) nonexclusive factors in order to determine the likelihood of confusion. *See Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1159 (5th Cir. Tex. 1982).

> In determining whether a likelihood of confusion exists, the Fifth Circuit has set out the following nonexhaustive list of factors: (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion. No single factor is dispositive, and a finding of a likelihood of confusion does not require a positive finding on a majority of these 'digits of confusion.' The digits 'do not apply mechanically to every case,' and the Court is to "consider the application of each digit in light of the specific circumstances of the case.' The court is also free to consider other relevant factors in determining whether a likelihood of confusion exists.

*One Hour Air Conditioning Franchising, LLC v. Moore*, 2007 U.S. Dist. LEXIS 81293, 6-8 (S.D. Miss. Oct. 16, 2007), quoting *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 483 and 485 (5th Cir. 2004).

In this case, evidence of patron confusion was displayed in a comment on Defendants' FaceBook page, which said, "Great group of people ... leading crossfit training." Exhibit "D," ¶ 13, Ex. 6. In light of the type of services Defendants provide, the facilities and manner in which their services are provided, and their use of internet and social media to advertise, it is apparent that Defendants' unlawful use CrossFit's mark in identifying their business as"CrossFitness" could confuse many other members of the public, easily leading them to believe that the Defendants' services were genuine, affiliate CrossFit services.

### a.    The Type of Mark Allegedly Infringed

This factor requires an analysis of the strength or weakness of the trademark. *Moore Business Forms v. Ryu*, 960 F.2d 486, 490 (5th Cir. Tex. 1992), *Sun Banks of Florida, Inc. v. Sun Federal Sav. & Loan Asso*c., 651 F.2d 311, 315 (5th Cir. Fla. 1981).

For marks consisting of words, as with the mark CROSSFIT®, strength is determined by classifying the mark into categories. *Sun Banks of Florida, Inc.,* 651 F.2d at 315.

> As the Supreme Court has noted, "[m]arks are often classified in categories of generally increasing distinctiveness; following the classic formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." Under this scheme, "'[t]he latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection,'" while "[g]eneric terms receive no trademark protection, [and] descriptive terms merit protection only if they have secondary meaning."

*Amazing Spaces, Inc.,* 608 F.3d at 240(citations omitted).[3]

> A generic term is the name of a particular genus or class of which an individual article or service is but a member. ... A descriptive term identifies a characteristic or quality of an article or service and, though ordinarily not protectable, may become a valid trade name if it acquires a secondary meaning. A suggestive term suggests, rather than describes, a characteristic of the goods or services and requires an effort of the imagination by the consumer in order to be understood as descriptive. A suggestive term requires no proof of secondary meaning in order to receive trade name protection. An arbitrary or fanciful term bears no relationship to the product or service and is also protectable without proof of secondary meaning.

*Vision Center v. Opticks, Inc.,* 596 F.2d 111, 115-116 (5th Cir. La. 1979)(citations omitted)

The name CrossFit is a strong, arbitrary mark coined by Plaintiffs, used over the years and across the globe to identify its distinctive fitness training regimen provided by closely trained and supervised affiliates. Exhibit "A," ¶¶ 5-6, 11. The mark does not suggest the specific services offered; however, even if its mark were categorized as "suggestive," like an arbitrary mark, a

---

[3]In *Sun Banks of Florida* and other cases in which only four categories are described, the categories cited here by the *Amazing Spaces* Court combine (4) arbitrary and (5) fanciful into one category, described as "fictitious, arbitrary or fanciful." See " *Sun Banks of Florida, Inc. v. Sun Federal Sav. & Loan Assoc.*, 651 F.2d 311, 315 (5th Cir. Fla. 1981).

suggestive mark is deemed to be inherently distinctive and therefore entitled to protection. *Amazing Spaces, Inc.,* 608 F.3d at 240.

In addition, CrossFit's mark is strengthened by the absence of third party use, as the mark "CrossFit" is not in use by unaffiliated businesses. A search of the mark "crossfit" in the Business Services listings on the Mississippi Secretary of State's website results in only twenty three (23) listings, twenty two (22) of which use the exact mark and are licensed CrossFit affiliates. Exhibit "F." Only one business – that of Defendant Columbus Crossfitness, LLC – appears with a variant of the mark within its name. It is not a mark that has a meaning or common use beyond that created by CrossFit. *Cf., Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir. Ga. 1980)(identifying multiple third-party registrations of the mark"Domino" for a wide variety of products, including large, established businesses or products reaching back for nearly a century).

In April, 2013, the Southern District of California recognized CrossFit as a famous mark. *See* Exhibit "B," *Order Granting Motion for Preliminary Injunction* entered in *CrossFit, Inc., v. Maximum Human Performance,* Case No. 12cv2348-BTM-MDD in the U.S. District Court, Southern District of California at p. 4. As demonstrated herein, the distinctiveness that the mark CROSSFIT® now enjoys is entitled to the protection sought and gained by Plaintiff's registering and gaining protectable ownership of the mark.

### b.    The Similarity Between the Two Marks

As shown by its registration with the U.S. Patent and Trademark Office, the mark, "CrossFit," is owned by CrossFit, Inc., without limitation as to font, style, size or color. Exhibit "A," ¶ 11, Ex. 2. Defendants are using the exact CROSSFIT® marks to advertise their fitness training

services by copying the precise mark "CrossFit" then adding the suffix "ness," whereby Plaintiff's mark "CrossFit" is used as a part of Defendants' business entity name, "CrossFitness."

The addition of the suffix "ness" does not provide the mark with a different or distinctive meaning; on the contrary, the addition of this particular suffix results in minimal, if any, change to Plaintiff's mark, and is likely to lead reasonable people in the market for a training program and/or facility to assume an affiliation with CrossFit, and a standard of excellence, that does not exist.

### c.     The Similarity of the Products or Services

The services offered by Defendants are identical to those offered by CrossFit. Both companies specialize in fitness instruction in a class environment. CrossFit is known for its high intensity workouts consisting of varied functional movements under time constraints, Exhibit "A," ¶ 3. Mr. Wiygul's gym is formulated around the same, distinctive, class-style program, and appears to be marketed as a CrossFit affiliate, even though Mr. Wiygul has not completed the necessary training or approval to do so. Exhibit "D," ¶ 9, Ex. 6;  Exhibit "A," ¶ 15.

"With this similarity of service comes the potential for the public's mistaken assumption of connexity between the providers of related services. The more likely the public is to make such an association, the less similarity in the marks is needed for a finding of likelihood of confusion." *Sun Banks of Florida, Inc. v. Sun Federal Sav. & Loan Assoc.*, 651 F.2d 311, 318 (5th Cir. Fla. 1981)(citations omitted).  The services offered by CrossFit and CrossFitness LLC appear identical in form, substance and function.  Defendants' services, if not identical to those of Plaintiff, are so close as to cause confusion to customers.

13

### d. The Identity of the Retail Outlets and Purchasers

Both CrossFit and Columbus CrossFitness, LLC, offer instruction in a class-type environment to individuals looking for athletic training. Both are based in community gym facilities and offer high intensity workout programs. Exhibit "A," ¶ 3. Therefore, the potential purchasers for each type of training and environment is identical as well.

### e. The Identity of the Advertising Media Used

Both Plaintiff and Defendants offer fitness services in a small communal gym setting, making internet websites, social media and word of mouth the primary marketing channels for both parties. Exhibit "A," ¶¶ 3, 5-6.

### f. The Defendant's Intent

"Proof of an intent to confuse the public is not necessary to a finding of a likelihood of confusion." *Elvis Presley Enters. v. Capece*, 141 F.3d 188, 203 (5th Cir. Tex. 1998), quoting *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985)("while evil intent may evidence unfair competition and deception, lack of guile is immaterial.")(internal citations omitted). However, "(i)f a mark was adopted with the intent to confuse the public, that alone may be sufficient to justify an inference of a likelihood of confusion." *Id.,* citing *Amstar Corp.*, 615 F.2d at 263; RESTATEMENT, supra, § 22 cmt. c.

Defendants' intent is easily inferred in this matter from the creation of the Defendants' entity and facility names, Columbia Crossfitness, LLC, and Crossfitness 24/7, from the exact mark CrossFit, for use in their business, *i.e.,* athletic training in the same type of gym environment, using

14

the same class-based teaching method, and consisting of the same high impact sort of program, that CrossFit has made famous.

However, Defendants' intent is confirmed by Mr. Wiygul's conduct after he was contacted by CrossFit. Both before and after Ms. Bobb sent him a formal cease and desist letter, Mr. Wiygul acknowledged his infringement by his multiple promises to remove infringing marks by dates certain; he followed up with Ms. Bobb claiming he had complied with her requests when he had not. Confronted with his deception by Ms. Bobb, Mr. Wiygul acknowledged his dishonesty to her, but thereafter evaded her while allowing infringing marks to remain on his Facebook page and website, and failing to dissolve Columbus CrossFitness, LLC. *See* Exhibit "D," ¶¶ 3-7. If ever Mr. Wiygul was unclear about the unlawfulness of his behavior it certainly was clarified for him, from CrossFit's first efforts to end his infringement, by April, 2013. His pattern of misrepresentation and evasion cannot be interpreted any other way than an intentional misappropriation of the CROSSFIT® marks to trade on the goodwill of CrossFit by promoting confusion in his customers.

Defendants purposefully chose to trade on the mark "CrossFit" in marketing its services, which include the same type of workout program as designed by Plaintiff, Exhibit "D," ¶ 9, Ex. 6, and thereafter continued to use their infringing marks despite representing to CrossFit that they no longer did so. Plaintiff does not need to prove whether they chose to do so to purposefully deceive customers. The fact remains that Defendant chose to use Plaintiff's exact trademark within its own mark to sell a service, which happens to be precisely the same service, physical fitness instruction, with the same distinctive features, that Plaintiff sells.

15

### g. Any Evidence of Actual Confusion

A comment left by a patron on Defendants' Facebook page, "Great group of people ... leading crossfit training," proves that actual confusion with CrossFit was caused by Defendants' infringing use of the CrossFit marks. Exhibit "D," ¶ 13, Ex. 6. Because Defendants have not responded to the Complaint and have not engaged in any substantive discussions with Plaintiff, Plaintiff has not been able to obtain evidence of additional incidents of actual confusion.

However, actual confusion is only one of the seven factors applied by this Circuit to determine the *likelihood* of confusion, which is the test of infringement: "(I)t is the accepted rule that (trademark) infringement may be established by showing only that confusion is likely, and there need be no showing of actual confusion or deception if the mark is of such character or is used in such a way as to likely confuse a prospective purchaser." *American Foods, Inc.*, 312 F.2d at 624.

Given the use of Plaintiff's exact mark within Defendants' mark, the identity of the services and their environment, and the distinctiveness of the CROSSFIT® marks, Defendants' patrons could reasonably have believed that their classes were licensed and endorsed by CrossFit, as was the person quoted above who posted his comment on Defendants' Facebook page. Defendants' services, as provided and as offered to the public using CrossFit's marks, caused that likelihood of confusion. The comment of the customer who identified the gym as offering "crossfit" training, left as it was on Defendants' Facebook page, provided even further opportunity for the public's confusion.

Under the facts of this case, Plaintiff has met its burden under the Lanham Act of establishing its ownership in a legally protectable mark, and proving Defendants' infringement of its mark by demonstrating the likelihood of confusion resulting from the Defendants' use of Plaintiff's marks.

Plaintiff therefore moves this Court for an entry of a judgment of default in its favor against Defendants Chance Wiygul and Columbus Crossfitness, LLC.

**B.   A DEFAULT JUDGMENT IS PROPER IN THIS MATTER AGAINST DEFENDANTS COLUMBUS CROSSFIT LLC AND CHANCE WIYGUL**

Rule 55(b)(2) of the Federal Rules of Civil Procedure authorizes the Court to enter judgment against a party that has defaulted. Although not favored, it is within the Court's discretion whether or not a default judgment is proper. *Wells Fargo Bank, N.A. v. Planetta Custom Homes, LLC*, 2013 U.S. Dist. LEXIS 140692 (S.D. Miss. Sept. 30, 2013), citing *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998). "(W)hen a party is in default, the Court accepts pleaded facts as true, but must still determine whether those facts state a claim upon which relief may be granted." *Carter v. KST Transp., Inc.*, 2012 U.S. Dist. LEXIS 53541, 6 (S.D. Miss. Mar. 21, 2012), citing *Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001). The Clerk's Entry of Default against Defendants in this matter was entered on October 16, 2013.

"Relevant factors for the court to consider on a motion for default judgment include whether material issues of fact are at issue, whether there has been substantial prejudice, whether the grounds for default are clearly established, whether the default was caused by a good faith mistake or excusable neglect, the harshness of a default judgment, and whether the court would think itself obligated to set aside the default on the defendant's motion." *Buckley v. Epps*, 2012 U.S. Dist. LEXIS 30122, 5-6 (N.D. Miss. Mar. 7, 2012), citing *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998). In this matter, the factors to be considered all weigh in favor of a default judgment for the Plaintiff, CrossFit.

17

### 1. Whether Material Issues of Fact Are at Issue

Plaintiff owns a registered trademark, which Defendants used to sell the exact same services for which Plaintiff's mark was registered. Exhibit "A," ¶¶ 11-13. Despite the fact that Defendants have not responded to the Complaint, Defendant Wiygul, on behalf of himself and Defendant Columbia Crossfitness, LLC, communicated over several months with Plaintiff's representatives about the issues material to Plaintiff's claims herein. In his communications with CrossFit, Mr. Wiygul never questioned or disputed Plaintiff's ownership of its mark; he never questioned or denied Plaintiff's allegations relating to Defendants' infringement of Plaintiff's mark. All communication between the parties related to Plaintiff's requests that Defendants cease all infringing use of its marks, and Mr. Wiygul's responses concerning his compliance with their requests. Exhibit "A," ¶ 16, Ex. 5; Exhibit "D," ¶¶ 3-7, 10-11. Based on Plaintiff's ownership of its registered trademark and the content of its numerous written and verbal communications with Defendant Wiygul, Plaintiff knows of no material facts that may be reasonably interpreted to be in dispute in this case.

### 2. Whether There Has Been Substantial Prejudice

CrossFit has suffered substantial prejudice due to the Defendants' continued misuse of its valuable trademarks. Both CrossFit and Defendants operate in the same industry, and, as illustrated herein, the services of Defendants have been, and will likely continue to be, confused with those of CrossFit. As a result, not only do licensed CrossFit trainers face the loss of potential customers, but by virtue of Defendants' substandard training being wrongfully associated by the public with CrossFit's mark, Plaintiff is exposed to potential damage to its reputation and goodwill.

In addition, CrossFit has gone to considerable time and expense to work with Defendant Wiygul to stop his unlawful use of its mark. However, due to Defendants' wilful misrepresentation of steps taken to removing their infringing marks, their failure to appear in this cause, and their refusal to cease all infringing actions, not only have the expenditures failed to remedy Defendants' infringement, but the only remedy Plaintiff has left to it in this matter is a default judgment. Without the Court's entry of a default judgment, Plaintiff has no other means to protect its registered trademark from Defendants' misappropriation.

**3.    Whether the Grounds for Default Are Clearly Established**

CrossFit's Complaint against Defendants' ongoing infringement of the CROSSFIT® Mark, setting forth its claims for trademark infringement, false designation of origin, violation of the Anticybersquatting Consumer Protection Act and trademark dilution, was served on both Defendants on August 15, 2013. Doc. #4, #5. The Clerk's Entry of Default was entered on October 16, 2013, against both Defendants. Doc. #12.

Plaintiff has demonstrated to the Court its ownership of a mark that was unlawfully appropriated by Defendants for their own use, and Defendants' intentional misrepresentation that they took corrective action while instead leaving the infringing marks in place. Not only have Defendants failed to appear in this cause after proper service was effected, but their conduct demonstrated a knowing, intentional infringement of Plaintiff's mark.

**4.    Whether the Default Was Caused by a Good Faith Mistake or Excusable Neglect**

In the circumstances, Defendants' default cannot reasonably be interpreted to have occurred through good faith mistake or excusable neglect. Plaintiff, through counsel, communicated with

19

Defendant Wiygul on several occasions to address his trademark infringement and to attempt an amicable resolution to Defendants' conduct. Mr. Wiygul never asserted a right to continue using his "Crossfitness" mark, but consistently agreed, without protest, that he would stop using Plaintiff's mark. Exhibit "A," ¶ 16, Ex. 5; Exhibit "D," ¶¶ 3-7, 10-11. Moreover, Mr. Wiygul actively deceived Plaintiff's counsel regarding his compliance, making the likelihood of mistake or neglect highly doubtful. Mr. Wiygul contacted Ms. Bobb claiming that he had removed all affiliations with CrossFit from his gym and replaced his sign with one that had no affiliation to CrossFit; when asked for a photo to confirm his claim, he alleged that a storm had damaged the sign. Exhibit "D," ¶¶ 5-7. Even after being confronted with Mr. Wiygul's dishonesty in May, 2013, Defendants continued to display infringing photos on their Facebook page, Exhibit "D," ¶ 9, and Columbus CrossFitness, LLC, remains in good standing with the Mississippi Secretary of State. Exhibit "E." No good faith mistake or excusable neglect was, or is, responsible for Defendants' default.

### 5.     The Harshness of a Default Judgment

Unlike a case in which a default judgment is entered as a sanction for the action or inaction of a party in the course of litigation, this case involves Defendants who, despite notice of the lawsuit by both service of process and discussion with Plaintiff's counsel, have chosen not to appear. Plaintiff's many efforts to resolve the issues created by Plaintiff's infringement, short of recourse to this Court, have not succeeded. The entry of a default judgment against these Defendants, who knew the allegations yet repeatedly stalled and misrepresented their efforts to cease their unlawful conduct, is justified in the circumstances. Any result to Defendants, harsh or otherwise, could easily have been avoided by them had they answered Plaintiff's Complaint or otherwise appeared in this case.

20

**6.  Whether the Court Would Think Itself Obligated to Set Aside the Default on the Defendant's Motion**

When the Court reviews a denial of a motion to set aside a default judgement, "(t)he ultimate inquiry remains whether the defendant shows 'good cause' to set aside the default." *Cjc Holdings v. Wright & Lato*, 979 F.2d 60, 64 (5th Cir. Tex. 1992). The non-exclusive factors the reviewing court may consider are "whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented." *Id.*

These factors have been detailed herein: service of Plaintiff's Summons and Complaint was properly made on Defendants, who failed to appear in this matter, making the default not only willful but presenting no defense at all. Docs. #4, #5. In addition, CrossFit would be highly prejudiced if a default in this matter were set aside. Plaintiff attempted to communicate with Defendants to resolve the pending issues numerous times. Exhibit "A," ¶ 16, Ex. 5; Exhibit "D," ¶¶ 3-7, 10-11. The number of attempts made by Plaintiff was a direct result of the repeated assurances and representations made by Defendant Wiygul that he would, or already had, ceased his infringement. Exhibit "D," ¶¶ 4-7. As can be seen from Plaintiff's efforts, nothing short of a default judgment will protect its registered trademark, and setting aside a default would work undue prejudice on CrossFit in the protection of its mark, particularly in light of its efforts to avoid litigation.

Defendants were informed by Plaintiff more than once of CrossFit's intention to seek recourse in this Court if Defendants did not comply. *See* correspondence at Exhibit "A," ¶ 16, Ex. 5; Exhibit "D," ¶ 11, Ex. 8. Defendant Wiygul's delaying tactics and misrepresentation to Plaintiff about his willingness to remove his infringing marks leave no doubt that Defendants had ample

notice and opportunity to appear. Nothing in the circumstances of this case would entitle Defendants to having a motion to set aside the default in this matter granted by this Court.

## C.  CROSSFIT'S REQUESTS FOR RELIEF

By this motion for default judgment, CrossFit requests $61,381.80 in damages and profits, in statutory damages, $12,426.61 in attorney's fees, and $1,191.59 in costs As set forth below, these remedies are supported by the Federal Rules of Civil Procedure and CrossFit's claims for violations of the Lanham Act.

### 1.  CrossFit Is Entitled to Damages and Profits Attributable to the Infringement and Treble Damages

For trademark infringement and false designation of origin claims, a prevailing plaintiff may be awarded defendants' profits, any damages sustained by the plaintiff, and the costs of the action. 15 USCS § 1117(a).  Actual damages may include, for example, injury to plaintiff's goodwill and business reputation.  15 U.S.C. § 1125(c).  The Court, in its discretion, may award treble damages for willful infringement.  15 U.S.C. § 1117(a).

The court is also accorded wide discretion to increase or reduce recoverable profits if it finds that the "amount of the recovery based on profits is either inadequate or excessive . . . according to the circumstances of the case." *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 694 (5th Cir. Tex. 1992)  No specific factor is required for a court's determination of whether or not an award of profits is appropriate; however, relevant factors include, but are not limited to, defendant's intent to confuse or deceive, whether sales have been diverted, the adequacy of other

remedies, any unreasonable delay by the plaintiff in asserting his rights, the public interest in making the misconduct unprofitable, and whether it is a case of palming off. *Id.* at 695.

In this case, Defendant's failure to appear in this cause, or to engage and communicate with Plaintiff in a meaningful way, have prevented CrossFit from precisely calculating its actual damages and Defendants' profits resulting from Defendants' unlawful infringement of Plaintiff's mark. Although Plaintiff would be entitled to treble damages in this matter due to Defendants' willful conduct and infringement, the full extent of CrossFit's damages are impossible to calculate due to Defendants' failure to respond to this action.

CrossFit believes that a conservative, reasonable estimate of profits and treble damages, given the willful conduct of the Defendants described herein, is $75,000.00, as Defendants' past and ongoing conduct is damaging to CrossFit's reputation and goodwill, and further supports the requested amount. Defendants have not attempted, nor passed, the licensing requirements of CrossFit, Inc., to be allowed to train patrons using the name "CrossFit." Exhibit "A," ¶ 12. As a result, the quality of Defendants' training is likely substandard and does not comply with CrossFit, Inc.'s requirements.

Particularly in light of Defendants willful deception that they had removed infringing marks when they had not, and their knowing refusal to appear in this matter, Plaintiff is entitled to the relief available under the authorities cited. Otherwise, Defendants are rewarded for their refusal to cease their infringement and their refusal to participate in this lawsuit, to Plaintiff's prejudice and ongoing harm.

### 2. CrossFit Is Entitled to the Costs Incurred in This Lawsuit

Plaintiff is also entitled to its costs incurred in this action. Rule 54(d)(1) of the Federal Rules of Civil Procedure provides that costs should be allowed to a prevailing party; 15 U.S.C. § 1117(a) provides that costs may be recovered for established violations of the Lanham Act. Plaintiff is entitled to costs for Defendants' false designation of origin, as set forth in 15 U.S.C. § 1125(a).

CrossFit is the prevailing party in this action by virtue of Defendants' default. As discussed above, CrossFit has established its false designation of origin claim[4] under the Lanham Act by way of the instant motion. To date, CrossFit has incurred $1,191.59 in compensable litigation costs, consisting of filing fees and fees for service, and thus requests a costs award in this amount. Exhibit "D," ¶ 18.

### 5. CrossFit Is Entitled to Its Attorney's Fees

CrossFit also requests the attorney's fees it has incurred in the amount of $10,310.00 in litigating this action as an "exceptional case," as provided under the Lanham Act in 15 U.S.C. § 1117(a). "Under § 1117, the court may award attorneys fees in 'exceptional cases.' 'The exceptional case is one in which the defendant's trademark infringement can be characterized as malicious, fraudulent, deliberate, or willful, and . . . it has been interpreted by courts to require a showing of a

---

[4] 15 U.S.C. § 1125(a)(1)(A) provides that one who "on or in connection with any goods or services ... uses in commerce any word, term, name, ... or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

high degree of culpability.'" *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 372-373 (5th Cir. Tex. 2000)(citations omitted).

Willful, fradulent and deliberate conduct is easily established here. CrossFit repeatedly notified Defendant Wigul that he was engaging in infringing uses of the CROSSFIT® Marks. After promising to remove the offending marks from his gym, Mr. Wiygul continued their use and ignored CrossFit's request to cease and desist infringement, thus requiring CrossFit to file the instant lawsuit to protect its intellectual property. Exhibit "A," ¶ 16; Exhibit "D," ¶¶ 3,7, 12-13. Defendants' willful infringement of the CROSSFIT® Marks and Defendant Wiygul's subsequent deception in saying he had complied with CrossFit's cease and desist requests, as well as Defendants' disregard of the Complaint and the proceedings herein, demonstrate the exceptional circumstances justifying an award of attorney's fees.

### 6. CrossFit Is Entitled to Injunctive Relief

Although Defendants are on notice of their infringement, having been alerted by CrossFit through its cease and desist efforts and the instant lawsuit, Defendants' continued use of the CROSSFIT® Marks long after Plaintiff's requests that they cease their infringment demonstrates that Defendants are unwilling to stop their unlawful behavior without being enjoined from doing so. This conduct constitutes willful infringement of CrossFit's exclusive rights to its trademarks and justifies a permanent injunction.

Permanent injunctive relief to prevent or restrain trademark infringement is authorized under the Lanham Act. 15 USCS § 1116(d).

> It is well-established that the party seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that,

considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion.

*Abraham v. Alpha Chi Omega*, 708 F.3d 614, 626-627 (5th Cir. Tex. 2013) citing *eBay Inc. v. MercExchange*, LLC, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) (citations omitted).

As shown above, all of the elements supporting a permanent injunction are present here.

### a.     CrossFit has suffered an irreparable injury

"As to the first factor, a leading treatise states, 'All that must be proven to establish liability and the need for an injunction against infringement is the likelihood of confusion – injury is presumed.'" *Abraham*, 708 F.3d at 627, quoting 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:2 (4th ed. 2001). The likelihood of confusion in this case has been shown both in the actual confusion evidenced in a comment on Defendants' Facebook page, Exhibit "D," ¶ 13, Ex. 6, and in the facts set forth *supra* demonstrating the existence of the seven (7) nonexclusive factors used by the Fifth Circuit to determine the likelihood of confusion in trademark infringement cases. *See Armco, Inc.*, 693 F.2d at 1159.

For the reasons cited previously, proof of the extent of actual injury to Plaintiff's goodwill as well as lost profits has not been available to Plaintiff due to Defendants' failure to appear, but even with proof, it would be difficult to reduce to money damages the harm done to Plaintiff's goodwill and control of its mark. A permanent injunction will work to prevent additional and ongoing injury resulting from Defendants' unlawful appropriation of Plaintiff's mark.

> **b.** **Remedies available at law are inadequate to compensate CrossFit for injury caused by Defendants' infringement**

Defendants have repeatedly resisted Plaintiff's cease and desist attempts, misrepresenting that they would remove all infringing marks even as they continued their unlawful use of Plaintiff's marks. Defendants' actions evidence their intent to continue their unlawful use of the CROSSFIT® Marks by forcing Plaintiff to bring this lawsuit; by failing to appear in this action, they show little regard for the authority of the Court. Defendants' contempt for Plaintiff's control of its reputation, loss of trade, and loss of goodwill results to irreparable harm to Plaintiff.

> **c.** **Upon consideration of the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted**

Granting injunctive relief to Plaintiff will not cause hardship to Defendants other than the loss of illegal gains they made by using Plaintiff's trademark. Any difficulties or inconvenience occasioned by an injunction would directly result from Defendants' initial infringement and/or their ongoing refusal to cease and desist their unlawful use of the CrossFit mark. Indeed, the only "hardship" upon Defendants is that they obey the law and respect Plaintiff's registered trademark.

> **d.** **The Public Interest Would be Served by a Permanent Injunction.**

Members of the public who seek authorized CrossFit training, and the benefit of a nationally standardized accreditation program provided to their affiliated personal trainers, also deserve the benefit of the reliability and quality represented by the CrossFit mark. Those affiliates which lawfully use the Plaintiff's mark provide a level of training that Defendants have never attained. It is reasonable to assume that a customer in the market for CrossFit classes wants exactly that – CrossFit classes. Therefore, not only CrossFit, but members of the public seeking fitness training, would be protected by an injunction against Defendants' further unlawful use of Plaintiff's mark.

The public has come to expect a variety of fitness services in most communities, and even with a permanent injunction in place, the consumer's choice of fitness training, including Defendants,' will remain, as Plaintiff does not seek to enjoin their business entirely. However, Defendants have deceived the public into believing they offer genuine CrossFit classes when they have never been a licensed affiliate, and have demonstrated their intention to continue doing so.

In summary, CrossFit has met the elements required for the entry of a permanent injunction against Defendants, and therefore requests that Defendants be enjoined from using the CROSSFIT® Marks, or any derivation thereof, in the operation of their business, on their website, and elsewhere. Under the circumstances of this case, Plaintiff is justified in believing Defendants' infringement will continue without a permanent injunction against their infringing use of Plaintiff's marks. As set forth in its proposed order filed herewith, CrossFit requests that the following permanent injunction be entered:

> Defendants, individually and collectively, for themselves and their principals, partners, agents, servants, employees, independent contractors, and all persons in active concert and participation with them shall be permanently restrained and enjoined from infringing upon the "CrossFit" trademarks and from using any confusingly similar terms, in any manner, including but not limited to the following activities:
>
> - offering, providing, or purporting to offer or provide fitness classes or fitness training using the "CrossFit" name, and/or any confusingly similar terms, including but not limited to Cross Fitness, Xross Fitness, and XFit;
>
> - using the "CrossFit" name, and/or any confusingly similar terms, including but not limited to Cross Fitness, Xross Fitness, and XFit, on their websites (including but not limited to text in meta-tags), blogs, social media profiles, business directories and listings, advertisements, promotional materials, and third-party sites where company information is

submitted by Defendants regarding their personal training services, and at their facilities;

- registering, using, or selling any trademark, trade name, or domain names with the formative "CrossFit," and/or any confusingly similar terms, including but not limited to Cross Fitness, Xross Fitness, and XFit, and from encouraging or assisting any third party to do the same, in connection with any goods or services related or similar to those of CrossFit.

## V.

## CONCLUSION

CrossFit respectfully requests that this Court enter a default judgment in its favor and against Defendants, jointly and severally, in the total amount of $75,000.00: consisting of $61,381.80 in damages and profits, $12,426.61 in attorney's fees, and $1,191.59 in costs. Additionally, CrossFit respectfully requests that this Court enter a permanent injunction against Defendants to enjoin them from further use of the CROSSFIT® Marks. In the alternative, specifically for its prayer for damages and profits in the sums certain set forth herein, CrossFit requests that the Court enter an order for an accounting of Defendants' profits and Plaintiff's damages resulting from Defendants' infringement of the CROSSFIT® Marks, and that the Court enters its order for all other relief prayed for hereinabove, CrossFit prays further for all relief proper in the premises.

RESPECTFULLY SUBMITTED, this the 14th day of March, 2014.

**CROSSFIT, INC., PLAINTIFF**

BY: *s/ Christina G Bobb*
OF COUNSEL

BY: *s/ Nancy Siples Brumbeloe*
OF COUNSEL

## CERTIFICATE OF SERVICE

I, the undersigned, of counsel for Plaintiff, CrossFit, Inc., do hereby certify that I have this day served via U.S. First Class Mail, postage prepaid, a true and correct copy of the above and foregoing *Memorandum Brief in Support of Crossfit, Inc.'s Motion for Default Judgment and Permanent Injunction* to:

> Chance Wiygul
> 208 Conway Road
> Columbus, MS 39705
>
> Columbus Crossfitness, LLC
> c/o Its Registered Agent
> Chance Wiygul
> 208 Conway Road
> Columbus, MS 39705

This the 14th day of March, 2014.

> *s/ Nancy Siples Brumbeloe*
> OF COUNSEL

Prepared By:

PHILLIP C. SAMOARIS, ESQUIRE
samouris@higgslaw.com
CHRISTINA G. BOBB, ESQUIRE
cbobb@higgslaw.com
HIGGS FLETCHER & MACK, L.L.P.
401 WEST A STREET, SUITE 2600
SAN DIEGO, CA 92101
TELEPHONE: (619)236-1551
FACSIMILE: (619)696-1410

NANCY SIPLES BRUMBELOE– MS BAR #99896
nbrumbeloe@danielcoker.com
DANIEL, COKER, HORTON & BELL, P.A.
1712 15TH STREET, SUITE 400
POST OFFICE BOX 416
GULFPORT, MS 39502-0416
TELEPHONE: (228) 864-8117
FACSIMILE: (228) 864-6331